June Term, 1861.

KELLOGG
v.
CITY OF OSH-
KOSH.

---

## KELLOGG vs. THE CITY OF OSHKOSH, impleaded, &c.

| 14 | 623 |
| 79 | 378 |
| 14 | 623 |
| d99 | 508 |
| 14 | 623 |
| 57 LRA | 851 |

An unmarried man went to the city of Oshkosh in 1855, voted there in the fall of that year, and remained there most of the time for several years, most of his property being there, and that being his principal place of business, and he had never removed elsewhere with the intention of remaining, nor exercised the right of suffrage in any other place, though he was in the habit of spending portions of every year in different places abroad on account of his health. *Held*, that he was a resident of Oshkosh, and liable there to the payment of a tax upon personal property.

The act of voting in Oshkosh was the highest evidence that he had made that place his domicil.

The handing by the assessor to the tax payer, of the notice required by sec. 11, chapter 115, General Laws of 1858 (R. S., p. 243), which the latter refused to accept on the ground that he was a non-resident, was a sufficient service of the notice.

Sec. 31 of chap. 115 above cited repealed all acts or parts of acts conflicting with the provisions of that chapter, and those provisions being designed to constitute a uniform rule for all cities and towns, and being inconsistent with certain provisions contained in the charter of the city of Oshkosh (Private Laws of 1856, p. 248), necessarily operated as a repeal of the latter, although the charter declared that none of its provisions should be considered as repealed by any general law contravening them unless such purpose should be expressly set forth in such law.

One legislature cannot by such a provision bind a future legislature to a particular mode of repeal.

The assessment and equalization of taxes for the year 1858 was therefore properly made in the city of Oshkosh in accordance with the provisions of chap. 115 of the Laws of 1858.

The certificate prescribed by sec. 33, chap. 15, R. S. 1849, was superseded by sec. 16, chap. 115, General Laws of 1858; and the assessor's oath or affirmation therein prescribed was substituted for it.

June Term,   It was competent for the common council of the city of Oshkosh, under sec. 9,
   1861.        chap. 3 of its charter (Priv. Laws of 1856, p. 230), to designate a newspaper
                printed in the German language, as the official paper of the city, and the no-
KELLOGG         tice required by that section and published in such official paper was good if
   v.           published therein in the *English* language also.
CITY OF OSH-
KOSH.        A town treasurer may institute the special proceeding provided for in secs. 81
                and 82 of chap. 18, R. S. 1858, after the return of his warrant.

             The special proceedings had in this case under those sections, though not an estop-
                pel except as to the questions into which the justice was authorized to inquire,
                are *held* to have been regular and to have constituted a sufficient foundation
                for an execution issued under sec. 3, chap. 198, Laws of 1860.

             Equity will not interfere to aid a delinquent tax payer or to stay proceedings at
                law, for mere *irregularity*, or when it appears that the moneys demanded are
                justly and equitably due on account of taxes, but will leave him to his legal
                remedies.

APPEAL from the Circuit Court for *Winnebago* County.

The plaintiff alleged in his complaint, which was filed Ju-
ly 19, 1860, that he had never been a resident of the state
of Wisconsin; that he is the owner of lot 1 in block 10 in
the city of Oshkosh; that in the year 1858, he was assessed
in the 2d ward of that city, in the sum of $15,000, for per-
sonal property, the tax charged on which was $311 85 ; that
*after* the tax list of that year, with the warrant appended to
it, had been duly returned by the city treasurer to the com-
mon council of the city, to wit, on the 5th of September,
1859, the treasurer made an affidavit before a justice of the
peace in said city, stating that there was a tax upon person-
al property in said city assessed against the plaintiff *William
Kellogg*, which he had demanded payment of and was una-
ble to collect, whereupon said justice issued a summons re-
quiring the plaintiff to appear and show cause why he did
not pay said tax; that the plaintiff appeared before the jus-
tice, was sworn, and "was asked certain questions which he
answered under oath," but was not allowed to testify, as the
fact was, that he had not at any time resided in the city of
Oshkosh, and that he never had any personal property in the
state subject to taxation ; nor was he allowed to show those
facts by any other testimony; nor was it shown before the
justice by any evidence, that he had ever resided in the
state, or had any personal property therein subject to taxa-
tion; that the justice nevertheless made an order upon his

docket, under the title of "The City of Oshkosh against June Term, William Kellogg," requiring him (the present plaintiff) to pay said tax forthwith; that the testimony taken before said justice has never been filed in the office of the clerk of the circuit court for said county; but that on the 19th of April, 1860, a paper purporting to be a transcript of the docket of said justice, was filed in the office of said clerk, and on the 24th of the same month, the city of Oshkosh caused an execution to be issued by said clerk upon said order and transcript, and delivered to the sheriff of the county, who, on the 9th of July following, by virtue thereof, sold said lot 1 to the defendant *Rufus Kellogg* at public sale, for $362 32 (although the plaintiff, in the hearing of said *Rufus*, forbade the sale), and executed a deed therefor to said *Rufus*, who now claims to be the owner of said lot by virtue of that sale. The complaint also stated that the notice required by sec. 9 of chapter 8 of the charter of the city, was published in the *Deutsche Zeitung*, a newspaper printed in that city in the German language, and in no other paper, although there were newspapers of general circulation printed in the city in the English language, which alone was understood by the plaintiff and more than four-fifths of the people of the city; that no demand, except by the publication of said notice, had ever been made on the plaintiff for the payment of said tax, until the 5th of September, 1859; and alleged also various errors and irregularities in the tax proceedings, the nature of which is sufficiently indicated in the opinion of the court. The demand of judgment was, that the order made by the justice, and the assessment and tax, and the sheriff's deed, be declared void, &c.; and for general relief. The circuit court rendered judgment in favor of the plaintiff. A statement of the answer, and the finding of the circuit judge, is deemed unnecessary, as the points decided by this court will be readily understood from the opinion.

*N. L. Whittemore*, for the appellants, on the question as to the plaintiff's residence, cited 2 Parsc's on Con., 91, 92; 6 How. (U. S.), 185; 5 Pir' 370; 11 Mass., 350, 424; 7 id., 1; 15 Maine, 479; 1 Met., 242, 250; and contended that the provisions of chap. 115, General Laws of 1858 (R. S., pp.

Vol. XIV—40

*Margin right:* June Term, 1861.

Kellogg v. City of Oshkosh.

239—248), repealed the provisions of the charter of the city of Oshkosh that conflicted therewith.

*Bouck & Edmonds*, for respondents:

The board of assessors of the city of Oshkosh consists of five, one from each ward. The charter of the city of Oshkosh (chap. 8, Pr. L. 1856) consolidates the assessors into a board, requiring a majority to act, and consolidates the wards into one for the purposes of assessing and equalizing, requiring the roll to contain the taxable property of the whole city. Sec. 27, p. 255, requires the board of supervisors to consider the roll of the city as an entire roll. In 1858, the assessors did not organize as a board, but each one assessed the property of his own ward, and returned his separate roll of such property. This vitiated the tax, unless the act of 1858 helps it. Black. on Tax Title, 136—7; 18 Conn., 189 —197; 1 Kern., 571. 2. The act of 1858 (chap. 115) was not intended to effect any change in the number of assessors required by law, either in towns or cities. By Rev. Stat., 1849, ch. 12, sec. 6 (R. S. 1858, ch. 15, sec. 6), towns were and are authorized to elect "from one to three assessors" as may be ordered by the town meeting. Hence the phraseology of secs. 4, 19, 20 and 24 of the assessment laws of 1858. The whole purview of that act was entirely different from the provisions of chap. 8 of the charter of the city. 5 Hill, 225. The act of 1858 provided the "listing" system as a method of preliminary inquiry to be conducted by each assessor, after which the assessment is made by such number of assessors as may happen to be required for that purpose in any particular town or city. 1 Kern., 571—2; 18 Conn., 197. A general statute, without negative words, will not repeal the particular provisions of a former one, unless the two acts are irreconcileably inconsistent. 5 Hill, *supra*; 21 Penn., 37, 427; Sedg. on Stat., 123; Dwarris, 532. 3. The general statutes as to taxation relate only to taxes for town, county and state purposes, and have no application to taxes authorized by the charters of cities and incorporated villages, further than they are made applicable by express words of reference, either in the charter or the general statute. 20 N. Y., 387 and note; 9 Humph., 217; Black. on Tax Titles, 526. The pro-

visions of the charter of the city of Oshkosh (sec. 4, p. 249;
secs. 26, 27, p. 255, P. L. 1856,) remain in force notwithstand-
ing sec. 20, ch. 115, Laws of 1858, because, (1.) It was competent
for the legislature to provide a peculiar board and system of
equalization for that city, and having done so, and declared
that they intended such system to be permanent (Pr. L.
1856, sec. 22, p. 262), no repeal by implication should be
allowed unless the two provisions cannot stand together. 5
Hill, *supra.* (2.) The language of sec. 20 is general. The
phrase " if any city " does not necessarily include all cities.
The section contains no negative words. (3.) The language
may be applied to all those cities which were without a board
and system of equalization of their own expressly prescribed
by their charters, distinct from that of the state at large. 20
N. Y., 391, note; Black. on Tax Titles, 525, 527. (4.)
The board provided by sec. 20 is inferior to that provided in
the charter. (5.) The provisions of sec. 20, if applied to this
city, would repeal not only the system of equalizing, but the
manner of assessing prescribed by the charter. (6.) There is
authority for our construction. Sedg. on Stat., 123—4; Dwar-
ris, 514; 4 Term Rep., 2; 4 Seld., 526; Bridgman's Judg-
ments, 122; Cro. Eliz., 512; 2 Bing., N. C., 679; 1 Doug.,
188; *Foster's Case,* 77 Rep., 63.

*By the Court,* DIXON, C. J. The plaintiff's residence at
Oshkosh at the time the taxes were assessed, is not seriously
questioned by his counsel. If it were, it is clear that the
finding of the circuit judge could not in this respect be dis-
turbed. His own testimony fully sustains it. Every man
has, in law, a home or domicil. The plaintiff is an unmarried
man. He says he came to Oshkosh in the spring of 1855,
and remained until December, 1856; he voted there in the
fall of 1856, and a large share of his time has since been
spent there, the winter seasons being passed at different
places abroad on account of his health; most of his proper-
ty has been there and in that vicinity, and that has been his
principal if not his only place of business, and he has never
removed or gone elsewhere with the intention of remaining,
nor exercised the rights or privileges of a citizen at any oth-

er place.  This clearly made him a resident of Oshkosh. The act of voting was the highest evidence that he had changed his domicil, and made Oshkosh his home in intent as well as in fact.  In some cases it is regarded as conclusive on the subject.  *Shelton vs. Tiffin*, 6 How., 185.

The assessment and equalization of the taxes were regular and valid.  The assessor testifies that he handed to the plaintiff, at his office, on the first or second day of June, 1858, the notice required by section 11, chapter 115, Laws of 1858, (Revised Statutes, p. 243), which he refused to accept because he was not a resident of the city.  This was a sufficient service of the notice.  The assessment for the city was made by the assessors of the several wards, each acting within his own ward ; and the equalization by the mayor and the clerk, the alderman of each ward serving as a member of the county board of supervisors, and the assessors sitting as a board of equalizers, according to the requirements of chapter 115.  This was correct.  The provisions of that chapter, being general and designed to constitute a uniform rule for all cities and towns, and being inconsistent with the special proceedings prescribed by the charter (Pr. Laws of 1856, p. 248), necessarily operated as a repeal of them.  It is not pretended that one legislature can, by a provision like that contained in section 22 of chapter 11 of the charter (Pr. Laws of 1856, page 262), bind a future legislature to a particular mode of repeal.  By section 31 of chapter 115 (R. S., p. 248), all acts and parts of acts superseded by or conflicting with the provisions of that act were repealed.

The certificate prescribed by section 33, chapter 15, R. S. of 1849, was not required.  It was superseded by section 16 of chapter 115 (R. S., p. 244), and the assessor's oath or affirmation therein prescribed, substituted for it.

The notice required by section 9, chap. 8 of the charter (Pr. Laws of 1856, p. 250), was properly given by the treasurer. It was competent for the common council, under section 9, chapter 3 of the charter (Pr. Laws of 1856, p. 230), to designate a newspaper published in the German language as the official paper of the city, provided the publication was also made in the English language.  This it appears was done

The legislature well understood that newspapers in foreign languages were published in nearly all our large towns and cities, and if it had been the intention to restrict the council to such as were published in the English, words to that effect would no doubt have been used. Besides there may be places where such foreign language is mostly read and spoken, and a newspaper published therein may be the most efficient and useful channel of information. It does not appear that this was the case in Oshkosh, but in view of the well known facts we think it more reasonable to say that the legislature, by the general words used, intended to leave the choice of the official paper of the city, whether printed in one language or another, fully to the discretion of the council. When once known, as it soon must be, to all of the inhabitants of the city, no real inconvenience would arise from it, whatever might be the designation. But if the publication in the *Deutsche Zeitung* had been defective, it was clearly cured by that in the *Courier*.

The special proceeding instituted before Justice Colton, pursuant to sections 81 and 82 of chapter 18 of the Revised Statutes, although entitled to no effect as an estoppel, beyond the questions into which he was authorized to inquire, was nevertheless regular, and constituted a sufficient foundation for the execution issued as provided by section 3, chapter 198, Laws of 1860. The only objection taken to that proceeding or those which were subsequently had, is, that the treasurer had no authority to institute it after the return of his warrant. The statute contains no words to that effect, nor is such a limitation fairly to be implied from its provisions. It is a remedial statute, enacted for the public good, and therefore to be liberally construed so as to suppress the mischief and advance the remedy. We are of opinion that the treasurer was authorized to make and file the affidavit, and procure the summons to be issued.

It follows from what has been said, that the judgment below must be reversed. But there is another principle upon which this case would have been attended with the same result, if the proceedings to assess, levy and collect the taxes had been never so irregular, which may be properly men-

tioned. It is this. Equity will not interfere to aid the delinquent tax payer, or to stay proceedings at law, for mere irregularity, or when it appears that the moneys demanded are justly and equitably due on account of taxes. It will leave him to his legal remedies. *Warden vs. Supervisors of La Fayette County*, [ante, p. 618]. It appears from the testimony of the plaintiff, that the amount assessed against him did not exceed, and probably fell short of, the actual value of his taxable personal property.

The judgment of the circuit court is reversed, and the cause remanded with directions that the complaint be dismissed, with costs.